Good morning, Your Honors. My name is Sean Serigat. I represent the Meged family, the petitioner, and I'm here in court in the second period. If I can have you stand up for a second. Thank you. I would like to reserve two minutes for rebuttal, if I can. Your Honors are familiar with the facts of the case based on the record of the proceedings that has been offered, but since at the heart of the court's determination is whether substantial evidence compels a finding of asylum based on the facts, I will go over a laundry list of what has happened to my client. Let me ask you a question first, if I may. One of the things that happened here was that the immigration judge declined to believe your client made an adverse credibility finding. And my question to you is whether that finding was challenged at the BIA level. Your Honor, it wasn't because I did not believe that the immigration judge actually made a credibility finding. He made an implied credibility finding, maybe because of what he had said, but there was no specific credibility finding. And as your Honor knows, implicit adverse credibility findings based on Kaloubi or Mendoza Manimboa are not accepted in this court. I do realize that this was raised later on by the respondent or the petitioner in her Ninth Circuit claim so that the court could address it, but the initial credibility finding was an implicit one. So if we were to hold that it was only implicit but not explicit, then your clients would be deemed credible. But if we were to find that the finding was an actual explicit adverse finding and you didn't challenge it, then we wouldn't be able to revisit it. Is that a fair summary? Somewhat, your Honor. I believe that based on Camus, Sanchez, and Chen, a specific credibility finding must be found to allow the petitioner to respond to it, and then the immigration judge or the BIA must address their response to that finding on credibility, and that was not done here. There was no there there. The respondent, the petitioner, did not know what part of the credibility issues she needed to address. And your Honor, we have raised this, or the petitioner has raised this in the Ninth Circuit brief. The issues that were raised did not comport to the facts or the testimony that was brought out in the court. There were certain mistakes of fact that the judge made or assumptions that the judge made that were not part of the record. Okay. Why don't you go back to the thread that you wanted to start with, which is what occurred and why it constitutes past persecution? Yes, your Honor. And I am doing this solely because the court is aware of the case of Korbalina and Vajini that have come after that. The issue is whether the societal harm raises to the level that it would amount to persecution and whether the societal harm was unchecked by the government or the government was unable to get under control. The respondents suffered ridicule. They were ostracized because of the fact that Ms. Majid had converted to Judaism. They were forced out of their job. The male petitioner couldn't finish his school. The male petitioner was demoted from an engineer to a mechanic in the place of work. There was vandalism of their house. There were stars of David put by the mailboxes. The name Jid, which is an equivalent of a derogatory term, Kaik, was written on their mailboxes. There were menacing threats to them. At one point, she described that when she would go to the church, they would call her names. And one time near her home, they told her it wouldn't be good for you to go to church. Well, but obviously under the law, persecution goes beyond discrimination and name calling. What evidence is there that your clients have previously experienced conduct that rises to the level of persecution? That's not name calling and it's not discrimination? I mean, I'm not condoning that behavior. Please understand that. But we obviously have to follow the law, too. I understand. I believe that if your honors take each one of these instances, they would be unpleasant. They would be regrettable, disturbing. But by themselves, they may not rise up to that level. But when you put them collectively, cumulatively in their aggregate, they go beyond the pale of mere regrettable or disturbing instances. They actually rise up to the level of persecution. Discrimination certainly is a condition that likely will exist before there's persecution. But persecution goes beyond discrimination. And I guess to me, that's your that's your burden to to take forward here and to tell us whether this record supports that. Your Honor, this happened to them over a long period of time. It was pervasive. It was severe. And again, when you put them cumulatively, it is not just mere discrimination. What was the nature of the threats as disclosed in the record? On one instance, the female respondent, Ms. Majid, stated that on the occasion that she was coming back home, ultra-nationalist members of RUK stopped her near her house. There were a few of them who were wearing their uniforms, their ultra-nationalist uniforms, and they told her it wouldn't be good for you to go to church in a menacing way. A reasonable person subjectively would take that to be a threat on their life. On another occasion, their house was searched and ransacked. She explained that their telephone was bugged in the house, that she was taken in for interrogation, that they conducted a search of their house, although the immigration judge took issue with that and said this was a warranted search of the house. The manner in which it was done and the things that were taken and what they said to her, they said, we can actually frame you with drugs or some crime. To me, those are all threats on liberty and life. And again, cumulatively, they would rise up to that level that one would fear for their life. That being the case, what evidence do you have that your clients will experience persecution if they return to Ukraine? And specifically, what significance should we give to the State Department reports that a number of Jewish schools, theaters, universities, and synagogues have risen in the years following the collapse of the Soviet era? Your Honor, as we had mentioned in our brief, the State Department report for 1996 only in part mentions that the situation has improved since the Soviet time. However, when you look at the report closely, it states not all potentially relevant incidents of persecution in the country were mentioned in the report. The report was not actually used to discredit the specific incident that the respondent or the petitioner refers to. The report is written by the State Department at a time that the State Department wishes for a country that has gotten free from the yoke of totalitarian regime to look better in the world. We have cases on the record that there is always a concern that the State Department soft-pedals some situations. But even if we take the State Department for what it is, it actually mentions under the heading religious minorities, some ultra-nationalist Ukrainian groups like UNAUSO or DSU circulate anti-Semitic tracts. Anti-Semitic articles continued in a few local newspapers, especially in Western Ukraine or Kiev, where the petitioner is from, where they publish anti-Semitic diatribes and are not prosecuted under relevant law. It would be nice for a government to, as a window dressing, create laws, but it would be even nicer for them to implement the laws. It doesn't look like in the Ukraine this was going on. When you do not implement the laws that are on the books, that is a tacit approval of the discriminatory activities of the groups that are out there. The State Department also says anti-Semitic incidents continued in some regions. The State Department also says death threats were made against Jews in Kharkin, which is close to Kiev. Some Jewish cemeteries were vandalized. The judiciary is indifferent and lacks sufficient staff and funds. I believe that the State Department for 1996, even taken on its face, shows that the respondents' testimony could be credible. And unless there is some indication that it wasn't, we have to accept them. Another thing, Your Honor, neither in the IJ's report nor in the summary affirmance from the BIA did they mention about 100 pages of other country material that the petitioner had offered. Since the State Department may have other motives for soft peddling, it would be at least nice to have the respondents' documentation, background country information also reviewed, and in this case it wasn't. On top of that, there was an expert witness for the country, Mr. Cutler, and his testimony was completely disregarded without any specifics as to why. Thank you, Faisal. We'll hear from the government now. Good morning and may it please the Court. I'm Greg Mack, Counsel for the Attorney General. In this case, Your Honor, the petitioner did not exhaust the credibility issued before the Board of Immigration Appeals. Was there an express adverse credibility finding? There was an express credibility finding, Your Honors, at page 89 and 90 of the record. There's one specific credibility determination and there are several statements by the immigration judge that her testimony was contrary to statements by the asylum officer. But if you turn to page 89 and 90 of the immigration judge's decision of the record here, with respect to testimony about the threats in 1992 by the alleged skinheads, there was a constant changing of testimony to sort of fit the question that the IJ or the government had as to, well, how did the alleged skinheads know that you were Jewish? Because after all, Professor Cutler, the expert in this case that testified with the petitioner, the lead petitioner here, doesn't appear to be ethnically Jewish, that she appears to be of Russian origin. So the questions were put to the lead petitioner as to, well, how did they know that you were Jewish? And there was a constant changing of testimony in that regard, and there's an explicit credibility determination. In what words do you see an explicit credibility finding of the kind that says, I have considered the petitioner's credibility and I find that she is not credible? That's the kind of thing that I'm looking for. Well, at page 90, Your Honor, it says, this continued change of story, however, is not convincing to the court of a credible claim, but one when faced with a contradiction then tries to find another example or explanation for the inconsistency. Well, certainly that's a questioning of credibility, but haven't we normally required an express finding in so many words? Not just questioning whether, well, this doesn't seem to make sense to me, or I'm not sure that this is a believable claim. Your Honor, this isn't a close question as to whether it's a credibility finding or not. The immigration judge goes on to say this does not add a claim to an alien's assertion of credibility of a claim. That sentence makes no sense. I don't even understand that sentence. It's clearly speaking to the alien's credibility. It is. It's questioning it. But don't we require more than questioning it to have an adverse credibility finding? I don't know that the court has asked for a specific formula or specific terms of art, if you will, with respect to an adverse credibility finding. But clearly, with respect to page 90 of the record, the immigration judge is pointing to. Well, most judges of whatever tribunal usually know how to say, I do not believe this witness or words to that effect. And we don't have anything that plain and clear in this case. Well, again, I would point the court to page 90 of the record where it may not be with respect to terms of art stating that there is no, I don't find this position credible. But there's a statement by the immigration judge that this does not add to the alien's credibility. So I would point to pages 89 and 90. OK. I am concerned about some of the discussion, and I think it comes from the the country report. But on page 80 and on beyond starts in regard to discrimination on the basis for race or religion. A new constitution of Ukraine prohibits discrimination on the basis of race, sex and other grounds. However, due in part to the absence of an effective judicial system, the government has not always been able to effectively enforce many of these provisions. So it's a societal anti-Semitism still exists. The government has not prosecuted anti-Semitic acts under the laws forbidding the sowing of inter-ethnic hatred. And then there's a discussion that flows on from there. Now, doesn't that raise a big red flag in the middle of this proceeding as to exactly what's going on here? You know, there's a very slight there is a slight step between discrimination and persecution. But doesn't this sow the seeds of persecution? And, you know, we're no strangers in this country. We're no strangers in the world we've come up in as to discrimination and particularly discrimination against Jewish people. And the immigration judge notes that as well, that there is discrimination, certainly religious and ethnic discrimination in this country as well. But the law is that mere discrimination, as abhorrent as it is, doesn't rise to the level of persecution. With respect to the judiciary, at page 80 also of the record, it notes that a Kiev arbitration court sided with the transferring of title to a synagogue in this case. So there may be, with respect to the State Department reports, evidence that there still exists societal discrimination and anti-Semitism. But it doesn't pervade the country. There doesn't seem to be a national will towards anti-Semitism based on this particular record. So the immigration judge clearly notes that there is societal discrimination in that regard. But there's no governmental action or effort behind that discrimination. In particular... Does there have to be active government activity or is it enough that a government is unwilling and unable to control it? Well, there's both parts of that, Your Honor. The law, of course, states that if the government is unwilling or unable to control it, then that might rise to the level of persecution. But in this particular case, we don't have instances of the lead petitioner or others reporting these incidents to the government, such that the government has an opportunity to then respond to the lead petitioner's claims. So in that regard, you have to give the foreign government an opportunity to respond to an allegation that there's been an anti-Semitism with threats and discrimination and actions behind that. But in this particular case, we don't have any physical harm to the lead petitioner. And we don't have any evidence that I can recall from the record as to reporting of these incidents to the Ukrainian officials. But even if the petitioner is credible, which we don't concede, but even if the petitioner is credible, the immigration judge found that this case did not rise to the level of persecution in this case. And there was five incidents that were reported by the lead petitioner. One was the 1983 application to the university. Later, she did again admission to the university. And there was also, there wasn't clear indication from the lead petitioner as to how her grades compared between when she alleged she was denied in 1983 and when she later was admitted in 1984. So there isn't a clear compelling evidence that Jewish discrimination or anti-Semitism led to denial in 1983. And then on top of that, there was a questioning of her credibility with respect to the denial in 1983, because she didn't convert to Judaism until 1991, and the Jewish stepfather didn't marry her mother until 1985. So the immigration judge had a question as to how she was able to deal with anti-Semitism in the denial of 1983. With respect to the allegation of the husband losing a good-paying job due to marriage, again, there was a question of credibility. The marriage occurred in 1989, but again, she didn't convert to Judaism until 1991. And then there's no evidence in this record that the loss of a good-paying job led to any economic devastation, so that didn't rise to the level of... Well, maybe part of the question here is where does this go from Kristallnacht to Auschwitz in another national setting that we have observed in the past? I'm not sure I understand your question, Your Honor. Maybe it wasn't a question, but I guess the first step in Germany was Kristallnacht, which was physical damage to synagogues and so on. And then things progressed to the point where there were the death camps at Auschwitz. And where along the way do we draw the lines here? We draw the lines in looking at specific conduct, specific allegations. And when there are specific allegations of anti-Semitism, and if there's specific conduct backing up those threats, and we look at the government's response to those threats, to that anti-Semitism, and to any harm to the particular individual, we don't have that evidence in this particular case. We don't have reporting of incidents to the Kiev authorities or the Ukrainian authorities. We don't have, in this record, evidence of actual physical harm. We have serious questions of credibility. The immigration judge may not have met the talismanic terms of art with respect to an adverse credibility determination, but we have serious questions of credibility in this case. Let me also briefly address the Korablina decision. The Korablina decision certainly puts together a picture with respect to that petitioner. But that petitioner had actual physical harm involved. And there was also, I believe, pre-communist era anti-Semitism involved in the Korablina case. In this case, we have post-communist Soviet era activity going on. In that regard, Your Honor, I'll conclude, and the government will submit. Thank you, counsel. Mr. Sedekat, you used your time, but we will restore one minute for rebuttal if you'd like to take it. Yes, Your Honor. Your Honor, driving over here today, I heard on the news that the government of the United States had secretly helped the current president, Yushchenko, of Ukraine. It's very telling that our State Department report painted a rosy picture of Ukraine back when, and now we helped the next person because we believe that the last government was totalitarian or not entirely democratic. I quote the words of Judge Posner from the Seventh Circuit. A lack of clear determination on credibility by the IJ is a fatal default. Affirmance by the board without an opinion where the IJ's opinion contains manifest errors of logic and reason is a fatal error. The government and the IJ are fixated on five grounds or five instances where, in fact, there were 14 instances. And I have, again, a list of them. To discount nine other incidents and only fixate on five of them is incorrect because the cumulative effect of all 14 instances is what rises this to a level of persecution. Thank you, counsel. The case just argued is submitted. We will next hear argument in United States v. DuPas. I'm not sure how to pronounce that. And I believe counsel in United States v. Comer, by means of a letter, has advised us that there's a motion to dismiss or withdraw the appeal voluntarily.
judges: Gibson, Graber, Callahan